UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

MICHAEL MAZZA, individually, and as
representative of a Class of Participants
and Beneficiaries of the 401(k) Retirement
Plan for Reynolds Consumer Products (a/k/a
Employee Savings Plan),

       Plaintiff,

       v.

REYNOLDS CONUSMER PRODUCTS, LLC

       and

THE BOARD OF DIRECTORS OF REYNOLDS
CONUSMER PRODUCTS, LLC,

       Defendants

Case No: 1:22-cv-5052

CLASS ACTION COMPLAINT
FOR CLAIMS UNDER
29 U.S.C. § 1132(a)(2)

---

COMES NOW Plaintiff, Michael Mazza, individually and as representative of

a Class of Participants and Beneficiaries of the 401(k) Retirement Plan of Reynolds

Consumer Products (a/k/a Employee Savings Plan) (the "Plan" or "Reynolds Plan"),

by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against Defendants,

alleges and asserts to the best of his knowledge, information, and belief, formed after

an inquiry reasonable under the circumstances, the following:

## **INTRODUCTION**

1.    Under the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1001 *et seq.*, plan fiduciaries must discharge their duty of prudence "with

the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

2.    The ERISA fiduciary duty of prudence governs the conduct of plan fiduciaries and imposes on them "the highest duty known to the law." *Donovan v. Bierwirth*, 680 F.2d 263, 272 n. 8 (2d Cir. 1982.)

3.    The law is settled under ERISA that, "a categorical rule is inconsistent with the context-specific inquiry that ERISA requires," *Hughes v. Northwestern Univ.*, 142 S. Ct. 737, 739 (2022), and "[a] plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones." *Id.* (*citing Tibble v. Edison Int'l*, 575 U.S. 523 (2015)).

4.    Even in a defined contribution plan in which participants are responsible for selecting their plan investments, *see* ERISA Section 404(c), 29 U.S.C. § 1104(c), "plan fiduciaries are required to conduct *their own independent evaluation* to determine which investments may be prudently included in the plan's menu of options." *See Hughes*, 142 S. Ct. at 742 (*citing Tibble*, 575 U.S. at 529–530) (emphasis added.) "If the fiduciaries fail to remove an imprudent investment from the plan within a reasonable time," fiduciaries "breach their duty [of prudence]." *Id.* Imprudent investments, as that term is used herein and by the United States Supreme Court, includes services provided by Plan recordkeepers. *See Hughes*, 142 S. Ct. at 742.

5. Defendants, Reynolds Consumer Products LLC (also referred to as Reynolds Services, Inc. ("Reynolds") and the Board of Directors of Reynolds Consumer Products LLC ("Board Defendants") (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary oversight, authority, or control over the 401(k) defined contribution pension plan – known as the 401(k) Retirement Plan of Reynolds Consumer Products (a/k/a Employee Savings Plan) (the "Plan" or "Reynolds Plan") – that it sponsors and provides to its employees.

6. During the putative Class Period (September 16, 2016, through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duty of prudence they owed to the Plan by requiring the Plan to "pay[ ] excessive recordkeeping fees," *Hughes*, 142 S. Ct. at 739-740, and by failing to timely remove their high-cost recordkeeper, Principal Life Insurance Company ("Principal").

7. These objectively unreasonable recordkeeping and administrative ("RKA") fees cannot be contextually justified and do not fall within "the range of reasonable judgments a fiduciary may make based on her experience and expertise." *See Hughes*, 142 S. Ct. at 742.

8. Defendants breached their fiduciary duty of prudence by causing the Plan participants to pay excessive RKA. Defendants unreasonably failed to leverage the size of the Plan to pay reasonable fees for Plan recordkeeping.

9.      ERISA's duty of prudence applies to the conduct of the plan fiduciaries in negotiating recordkeeping fees based on what is reasonable (not the *cheapest* or *average*) in the applicable market.

10.     There is no requirement to allege the actual inappropriate fiduciary actions taken because "an ERISA plaintiff alleging breach of fiduciary duty does not need to plead details to which he has no access, as long as the facts alleged tell a plausible story." *Allen v. GreatBanc Tr. Co.*, 835 F.3d 670, 678 (7th Cir. 2016).

11.     Moreover, courts should "decline to add a pre-pleading requirement that plaintiffs ask nicely for information they need—but cannot compel access to—before filing their complaint." *Allen*, 835 F.3d at 677.

12.     The unreasonable RKA fees paid inferentially tells the plausible story that Defendants breached their fiduciary duty of prudence under ERISA.

13.     These breaches of fiduciary duty caused Plaintiff and Class Members millions of dollars of harm in the form of lower retirement account balances than they otherwise should have had in the absence of these unreasonable Plan fees and expenses.

14.     To remedy these fiduciary breaches, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a), to make good to the Plan all losses resulting from these breaches of the duty of prudence.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 *et seq.*

16.     This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

17.     Venue is appropriate in this District within the meaning of 29 U.S.C. §1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District.

18.     In conformity with 29 U.S.C. § 1132(h), Plaintiff served the Complaint on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

19.     Plaintiff, Michael Mazza, is a resident of the State of Illinois and currently resides in Highland Park, Illinois, and during the Class Period, was a participant in the Plan under ERISA § 3(7), 29 U.S.C. § 1002(7).

20.     Plaintiff started in June 2012 as the Director of Marketing at Reynolds, and before he left his employment with Reynolds in July 2018, was promoted to Senior Director of Marketing. His employment was located at 1900 W. Field Court, Lake Forest, IL 60045.

21.     Plaintiff is a former participant of the Plan and paid excessive RKA fees during the Class Period. During his participation in the Plan, Plaintiff held different

investments in target date funds, international funds, bond funds, and small cap funds.

22.     Plaintiff has Article III standing as a former Plan participant to bring this action on behalf of the Plan because he suffered an actual injury to his own Plan account through paying excessive RKA fees during the Class Period, that injury is fairly traceable to Defendants' unlawful conduct in maintaining Principal as its recordkeeper, and the harm is likely to be redressed by a favorable judgment providing equitable relief to the Plaintiff and Class.

23.     Having established Article III standing, Plaintiff may seek recovery under 29 U.S.C. § 1132(a)(2), ERISA § 502(a)(2), on behalf of the Plan and for relief that sweeps beyond his own injuries.

24.     The Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the excessive RKA fees) necessary to understand that Defendants breached their fiduciary duty of prudence until shortly before this suit was filed.

25.     Having never managed a mega 401(k) Plan, meaning a plan with over $500 million dollars in assets, *see Center for Retirement and Policy Studies, Retirement Plan Landscape Report* 18 (March 2022) ("Mega plans have more than $500 million in assets,") Plaintiff, and all participants in the Plan, lacked actual knowledge of reasonable fee levels available to the Plan.

26.     Formed in 2010, Reynolds Consumer Products LLC ("Reynolds") is a provider of household products, including those that aid in preparation, cooking,

cleanup, and storage solutions. Products include Reynolds Wrap® aluminum foil and the Hefty® brand. Reynolds is headquartered in Lake Forest, Illinois, at 1900 W. Field Court, Lake Forest, IL 60045. In this Complaint, "Reynolds" refers to the named Defendants and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain, including "Reynolds Service, Inc.," which is named as the Plan Sponsor and Plan Administrator in the Form 5500 filed with the United States Department of Labor.

27.     Reynolds acted through its officers, including through the individual members of its Board of Directors ("Board Defendants"), to perform Plan-related fiduciary functions in the course and scope of their business. Reynolds, through its officers and Board members, appointed Plan fiduciaries and had a duty to oversee those appointees, and accordingly had a concomitant fiduciary duty to monitor and supervise those appointees. For these reasons, Reynolds and its Board members are fiduciaries of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

28.     The Plan Administrator is also Reynolds. As the Plan Administrator, Reynolds is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). Reynolds has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

29.     To the extent that there are additional officers and employees of Reynolds who are or were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers or consultants for the Plan during the

Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action.

30. The Plan is a Section 401(k) "defined contribution" pension plan under 29 U.S.C. § 1002(34), meaning that Reynolds's contributions to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 575 U.S. at 525.

31. In 2020, the Plan had about $879,161,567 in assets entrusted to the care of the Plan's fiduciaries. The Plan thus had substantial bargaining power regarding Plan fees and expenses. Defendants, however, did not regularly monitor Principal to ensure that it remained the prudent and objectively reasonable choice.

32. With 10,205 participants in 2020, the Plan had more participants than 99.82% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year. Similarly, with $879,161,567 in assets in 2020, the Plan had more assets than 99.78% of the defined contribution Plans in the United States that filed 5500 forms for the 2020 Plan year.

## ERISA'S FIDUCIARY STANDARDS IN THE DEFINED CONTRIBUTION INDUSTRY

33. Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an

individual account under a plan. An employer may also make matching contribution based on an employee's elective deferrals.

34.     Employees with money in a plan are referred to as "participants" under ERISA Section 3(7), 29 U.S.C. § 1002(7).

35.     Although Reynolds contributed employer matching contributions to Plan participants during the Class Period, these matching contributions are irrelevant to whether a Plan has paid excessive plan recordkeeping or managed account fees or other types of Plan expenses.

36.     While contributions to a plan account and the earnings on investments will increase retirement income, fees and expenses paid by the plan may substantially reduce retirement income. Fees and expenses are a significant factor that affect plan participant's investment returns and impact their retirement income.

37.     According to the United States Department of Labor, Employers must: (1) establish a prudent process for selecting investment options and service providers; (2) ensure that fees paid to service providers and other plan expenses are reasonable in light of the level and quality of services provided; and (3) monitor investment options and service providers once selected to make sure they continue to be appropriate choices. *See* United States Department of Labor, Employee Benefit Security Administration, *Meeting Your Fiduciary Responsibilities*, 12 at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf (last visited Aug. 11,

2022) (hereinafter "DOL Fiduciary Publication") ("If you are hiring third-party service providers, have you looked at a number of providers, given each potential provider the same information, and considered whether the fees are reasonable for the services provided?").

## Recordkeeping Services

38.     Defined contribution plan fiduciaries of mega 401(k) plans hire service providers to deliver a retirement plan benefit to their employees. There is a group of national retirement plan services providers commonly and generically referred to as "recordkeepers," that have developed bundled service offerings that can meet all the needs of mega retirement plans with same level and caliber of services. Principal is one such recordkeeper.

39.     These recordkeepers deliver all the essential recordkeeping and related administrative ("RKA") services through standard bundled offerings of the same level and quality as other recordkeepers who service mega plans.

40.     There are two types of essential RKA services provided by all recordkeepers. For mega plans with substantial bargaining power (like the Plan), the first type, "Bundled RKA," is provided as part of a "bundled" fee for a buffet style level of service (meaning that the services are provided in retirement industry parlance on an "all-you-can-eat" basis). The Bundled RKA services include the following standard services for all mega plans:

a.     Recordkeeping;

b.      Transaction Processing (which includes the technology to process purchases and sales of participants' assets as well as providing the participants the access to investment options selected by the plan sponsor);

c.      Administrative Services related to converting a plan from one recordkeeper to another recordkeeper;

d.      Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of other communications to participants, e.g., Summary Plan descriptions and other participant materials);

e.      Maintenance of an employer stock fund;

f.      Plan Document Services which include updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

g.      Plan consulting services including assistance in selecting the investments offered to participants;

h.      Accounting and audit services including the preparation of annual reports, e.g., Form 5500 (not including the separate fee charged by an independent third-party auditor);

i.      Compliance support which would include, e.g., assistance interpreting plan provisions and ensuring the operation of the plan follows legal requirements and the provisions of the plan (which would not include separate legal services provided by a third-party law firm); and

j.      Compliance testing to ensure the plan complies with Internal Revenue nondiscrimination rules.

41.    The second type of essential RKA services, hereafter referred to as "Ad Hoc RKA" services, provided by all recordkeepers, often have separate, additional fees based on the conduct of individual participants and the usage of the service by

individual participants (usage fees). These "Ad Hoc RKA" services typically include, but are not limited to, the following:

a.  Loan processing;

b.  Brokerage services/account maintenance;

c.  Distribution services; and

d.  Processing of Qualified Domestic Relations Orders (QDROs).

42.  For mega plans, like the Reynolds Plan, any minor variations in the level and quality of Bundled RKA services described above and provided by recordkeepers has little to no material impact on the fees charged by recordkeepers.

43.  For mega plans like the Reynolds Plan, Bundled RKA services are a commodity with little variation in price. *See* Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services (last visited Sept. 15, 2022) (stating that "[c]ustody and recordkeeping are 'commodity' services. Like any commodity, given equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants."); Allen Steinberg, *Unchecked Revenue: Show Me the Fees*, https://blog.retireaware.com/2018/01/12/unchecked-revenue/ (last visited Sep. 15, 2022) ("Recordkeeping services have pretty much become a commodity for retirement plan fiduciaries; virtually every major recordkeeper (and most minor ones) provide the same core services.")

44. All recordkeepers quote fees for the Bundled RKA services on a per participant basis without regard for any individual differences in services requested, which are treated by the recordkeepers as immaterial because they are inconsequential from a cost perspective to the delivery of the Bundled RKA services.

45. The vast majority of fees earned by recordkeepers typically come from the fee for providing the Bundled RKA services as opposed to the Ad Hoc RKA services.

46. Because dozens of recordkeepers can provide the complete suite of required RKA services, plan fiduciaries can ensure that the services offered by each specific recordkeeper are apples-to-apples comparisons.

47. Industry experts agree that plan fiduciaries use the Bundled RKA fee rate as the best and most meaningful way to make apples-to-apples comparisons of the recordkeeping fee rates proposed by recordkeepers.

48. Plan fiduciaries request bids from recordkeepers by asking what the recordkeeper's Bundled RKA revenue requirement is to administer the plan.

49. The Reynolds Plan had a standard level of Bundled RKA services, providing recordkeeping and administrative services of a nearly identical level and quality to other recordkeepers who also serviced mega plans during the Class Period.

50. There is nothing in the Reynolds Plan Form 5500 filings during the Class Period, nor anything disclosed in the Plan Participant section 404(a)(5) fee and service disclosure documents, that suggests that the annual administrative fee charged to Reynolds Plan participants included any services that were unusual or

above and beyond the standard recordkeeping and administrative services provided by all national recordkeepers to mega plans.

51.     By the start of, and during the entire Class Period, the level of fees that recordkeepers have been willing to accept for providing RKA has stabilized, and has not materially changed for mega plans, including the Reynolds Plan.

52.     Reasonable recordkeeping fees paid in 2018 are therefore representative of the reasonable fees during the entire Class Period.

53.     The underlying cost to a recordkeeper of providing recordkeeping to a defined contribution plan is primarily dependent on the number of participant accounts in the Plan rather than the amount of assets in the Plan.

54.     The investment options selected by plan fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping performed by the recordkeepers on behalf of the investment manager.

55.     Recordkeepers often collect a portion of the total expense ratio fee of the mutual fund in exchange for providing services that would otherwise have to be provided by the mutual fund. These fees are known as "revenue sharing" or "indirect compensation."

56.     The Reynolds Plan paid revenue sharing to Principal, as disclosed on the Plan's Form 5500 forms during the Class Period.

57.     The amount of compensation paid to recordkeepers must be *reasonable* (not the cheapest or the average in the market). *See DOL Fiduciary Publication*, at 6 ("[F]ees charged to a plan [must] be 'reasonable.' After careful evaluation during

the initial selection, the plan's fees and expenses should be monitored to determine whether they continue to be reasonable.").

58.     Reasonable, in turn, depends on contextually understanding the market for such recordkeeping services at the time at which the recordkeeping contract is entered. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014).

## THE PLAN

59.     During the entire Class Period, the Plan received recordkeeping services from Principal.

60.     At all relevant times, the Plan's recordkeeping fees were objectively unreasonable and excessive when compared with other comparable 401(k) plans offered by other sponsors that had similar numbers of plan participants and provide the same or similar level and quality of services.

61.     The fees were excessive relative to the level and quality of recordkeeping services received since the same level and quality of services are generally offered to mega plans, like the Reynolds Plan, regardless of the number of services selected by the Plan and regardless of the specific service codes utilized by the plan on the Form 5500.

62.     These excessive Plan recordkeeping fees led to lower net returns than participants in comparable 401(k) Plans enjoyed.

63.     During the Class Period, Defendants breached their duty of prudence to the Plan, to Plaintiff, and all other Plan participants, by authorizing the Plan to pay objectively unreasonable fees for recordkeeping services.

64.     Defendants' fiduciary mismanagement of the Plan, to the detriment of Plan participants and their beneficiaries, breached their fiduciary duties of prudence in violation of Section 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), and caused Plaintiff and members of the Class millions of dollars of harm to their Plan accounts.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

65.     Prudent plan fiduciaries ensure they are paying only reasonable fees for recordkeeping by engaging in an "independent evaluation," see *Hughes*, 142 S. Ct. at 742, and soliciting competitive bids from other recordkeepers to perform the same level and quality of services currently being provided to the Plan.  DOL Fiduciary Publication, at 12.

66.     Prudent plan fiduciaries can easily receive a quote from other record-keepers to determine if their current level of recordkeeping fees is reasonable in light of the level and quality of recordkeeper fees. It is not a cumbersome or expensive process.

67.     Having received bids, prudent plan fiduciaries can negotiate with their current recordkeeper for a lower fee or move to a new recordkeeper to provide the same (or better) level and qualities of services for a more competitive reasonable fee if necessary.

68.     A benchmarking survey alone is inadequate. Such surveys skew to higher "average prices," that favor inflated recordkeeping fees. To receive a truly "reasonable" recordkeeping fee in the prevailing market, prudent plan fiduciaries engage in solicitations of competitive bids on a regular basis, every three to five years.

69.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.*, 746 F.3d 327, 336 (8th Cir. 2014).

70.     First, a hypothetical prudent fiduciary tracks the recordkeeper's expenses by demanding documents that summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

71.     Second, to make an informed evaluation as to whether a recordkeeper is receiving no more than a reasonable fee for the quality and level of services provided to a plan, prudent hypothetical fiduciaries must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper.

72.     Third, a hypothetical plan fiduciary must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. By soliciting bids from other recordkeepers, a prudent plan fiduciary can quickly and easily gain an understanding of the current market for the same level and quality of recordkeeping services.

73.     Accordingly, the only way to determine the *reasonable*, as opposed to the *cheapest* or *average*, market price for a given quality and level of recordkeeping services is to obtain competitive bids from other providers in the market.

## PLAN FIDUCIARIES DID NOT EFFECTIVELY MONITOR RECORDKEEPING/RKA FEES AND THE PLAN PAID UNREASONABLE FEES

74.     A plan fiduciary must continuously monitor its RKA fees by regularly conducting an independent evaluation of those fee to ensure they are reasonable and remove recordkeepers if those fees are unreasonable. *See Hughes*, 142 S. Ct. at 742.

75.     During the Class Period, Defendants failed to regularly monitor the Plan's RKA fees paid to recordkeepers to Principal.

76.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from recordkeepers, including but not limited to Principal, in order to avoid paying unreasonable RKA fees.

77.     During the Class Period, and unlike a hypothetical prudent fiduciary, Defendants followed a fiduciary process that was done ineffectively given the objectively unreasonable RKA fees it paid to Principal, and in light of the level and quality of recordkeeper services it received.  Alternatively, to the extent there was a process in place that was followed by Defendants, it was done so ineffectively given the objectively unreasonable fees paid for recordkeeping services.

78.     From the years 2016 through 2020, the table below shows the actual year-end participants and annual RKA fees, illustrating that the Plan had on average 12,152 participants with account balances and paid an average effective annual recordkeeping/RKA fee of at least approximately $827,957, which equates to an average of at least approximately $68 per participant. These are the minimum amounts that could have been paid:

## Recordkeeping and Administration (RKA) Fees

| | 2016 | 2017 | 2018 | 2019 | 2020 | *Average* |
|---|---|---|---|---|---|---|
| **Participants** | 12,619 | 13,294 | 13,770 | 10,870 | 10,205 | *12,152* |
| **Est. RKA Fees** | $852,638 | $819,477 | $846,679 | $895,374 | $725,617 | *$827,957* |
| **Est. RKA Per Participant** | $68 | $62 | $61 | $82 | $71 | *$68* |

79.     From the years 2016 through 2020, the table below illustrates the annual RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above).

### Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500
(Price Calculations are based on 2018 Form 5500 or most recent if 2018 not available)

| Plan | Participants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard | White |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity | White |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity | White |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price | White |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West | White |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West | White |
| S Ca Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard | White |

| Employee Savings Plan Average Fee | 12,152 | $933,346,984 | $827,957 | $68 | Principal | Red |
|---|---|---|---|---|---|---|
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $376,314 | $31 | Great-West | White |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity | White |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity | White |
| Michelin Retirement Account Plan | 13,798 | $616,026,001 | $425,270 | $31 | Vanguard | White |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $635,857 | $39 | Voya | White |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard | White |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard | White |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $486,029 | $26 | Great-West | White |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $481,539 | $25 | Great-West | White |

80.     From the years 2016 through 2020, the graph below illustrates the RKA fees paid by other comparable plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, compared to the average annual RKA fees paid by the Plan (as identified in the table above), with the white data points representing RKA fees that recordkeepers offered to (and were accepted by) comparable Plans.



81.     From the years 2016 to 2020, the table and graph above illustrate that the Plan paid an effective average annual recordkeeping/RKA fee of at least $68 per participant.

82.     As noted above, the more participants a plan has, the lower the effective fee per participant that recordkeepers are willing to provide. The trend line in the graph represents a per participant fee rate for a given number of participants around which a plan fiduciary would expect to receive initial bids for the Bundled RKA services.

83.     When a plan fiduciary follows prudent practices as outlined by the Department of Labor, and solicits bids from several recordkeepers in a competitive environment, some initial bids for the Bundled RKA services would be below the trend line and others would be above the trend line. Ultimately, a prudent plan fiduciary

should be able to negotiate a Bundled RKA fee lower than the trend line such that the total RKA fee would be proximate to the trend line.

84. From the years 2016 through 2020, the table and graph above illustrate that a hypothetical prudent plan fiduciary would have paid on average an effective annual recordkeeping/RKA fee of around $32 per participant, if not lower.

85. From the years 2016 through 2020, and as also compared to other plans of similar sizes with similar amounts of money under management, had Defendants been acting with prudence, the Plan actually would have paid significantly less than an average of approximately $827,957 per year in recordkeeping/RKA fees, which equated to an effective average of approximately $68 per participant per year.

86. From the years 2016 through 2020, and as also compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, had Defendants been acting prudently, the Plan actually would have paid on average a reasonable effective annual market rate for RKA of approximately $388,851 per year in RKA fees, which equates to approximately $32 per participant per year. During the entirety of the Class Period, a hypothetical prudent plan fiduciary would not agree to pay *more than double* what they could otherwise pay for RKA.

87. From the years 2016 through 2020, the Plan additionally cost its participants on average approximately $439,106 per year in RKA fees, which equates to on average approximately $36 per participant per year.

88.     From the years 2016 to 2020, and because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants a total minimum amount of approximately $2,195,529 in unreasonable and excessive RKA fees.

89.     From the years 2016 to 2020, because Defendants did not act prudently, and as compared to other plans of similar sizes with similar amounts of money under management, receiving a similar level and quality of services, the Plan actually cost its participants (when accounting for compounding percentages) a total, cumulative amount in excess of $3,079,682 in recordkeeping/RKA fees.

90.     Defendants could have received recordkeeping services during the Class Period of the same level and quality from Principal or other recordkeepers that provide recordkeeping services to mega plan, like the Reynolds plan, because both the Plan 5500 forms and Plan fee disclosures to participants establish that the Plan received no services that were materially different than the services received by all the comparable plans in the chart above. There is no evidence, based on these Plan documents, that the plan received any additional services.

91.     Although the United States Supreme Court noted in *Hughes* that "[a]t times, the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise," *Hughes*, 142 S. Ct. at 742, reason-

able tradeoffs did not exist between recordkeepers providing a different level or quality of services.

92. Defendants failed to take advantage of the Plan's size to timely negotiate lower fees from its existing recordkeepers, Principal, and Defendants could have obtained the same Bundled RK&A services for less.

93. Plaintiff paid these excessive Bundled RK&A fees in the form of direct compensation to the Plan and suffered injuries to his Plan account as a result of paying these excessive fees.

94. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not regularly and/or reasonably assess the Plan's Bundled RK&A fees it paid to Principal.

95. During the entirety of the Class Period, and unlike a hypothetical prudent fiduciary, Defendants did not engage in any regular and/or reasonable examination and competitive comparison of the Bundled RK&A fees it paid to Principal vis-à-vis the fees that other RK&A providers would charge, and would have accepted, for the same level and quality of services.

96. During the entirety of the Class Period, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination and competitive comparison of the Plan's Bundled RK&A fees it paid to Principal, but Defendants either simply failed to do so, or did so ineffectively given that it paid twice as much for Bundled RK&A fees than it should have on average during the Class Period.

97. During the entirety of the Class Period and had Defendants engaged in

regular and/or reasonable examination and competitive comparison of the Bundled RK&A fees it paid to Principal, it would have realized and understood that the Plan was compensating Principal unreasonably and inappropriately for its size and scale, passing these objectively unreasonable and excessive fee burdens to Plaintiff and Plan participants and would have removed Principal as an imprudent choice.

98.     The Plan Bundled RK&A fees were also excessive relative to the services received, since the quality and level of such services are commodified for mega 401(k) plans like this Plan and are provided on an "all-you-can-eat-basis," based primarily on the number of participants a plan has. Any difference in Bundled RK&A fees between comparable plans is not explained by the level and quality of services each recordkeeper provides.

99.     During the entirety of the Class Period and by failing to recognize that the Plan and its participants were being charged much higher Bundled RK&A fees than they should have been and/or by failing to take effective remedial actions including removing Principal as Plan recordkeepers, Defendants breached their fiduciary duty of prudence to Plaintiff and Plan participants, costing them millions of dollars in lost of retirement savings.

## CLASS ACTION ALLEGATIONS

100.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action individually on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

101.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan.

Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the 401(k) Retirement Plan of Reynolds Consumer Products (a/k/a the Employee Savings Plan) (excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan) beginning September 16, 2016 and running through the date of judgment.

102. The Class includes over 10,000 members and is so large that joinder of all its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1).

103. There are questions of law and fact common to this Class pursuant to Federal Rule of Civil Procedure 23(a)(2), because Defendants owed fiduciary duties to the Plan and took the actions and omissions alleged as the Plan and not as to any individual participant. Common questions of law and fact include but are not limited to the following:

   a. Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

   b. Whether Defendants breached their fiduciary duties to the Plan;

   c. What are the losses to the Plan resulting from each breach of fiduciary duty; and

   d. What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

104. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Participant during the time period at issue and all Participants in the Plan were harmed by Defendants' misconduct.

105.    Plaintiff will adequately represent the Class pursuant to Federal Rule of Civil Procedure 23(a)(4), because he is a Participant in the Plan during the Class period, has no interest that conflicts with the Class, is committed to the vigorous representation of the Class, and has engaged experienced and competent lawyers to represent the Class.

106.    Certification is appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

107.    Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

108.    Plaintiff's attorneys are experienced in complex ERISA and class litigation and will adequately represent the Class.

109. The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts.

**FIRST CLAIM FOR RELIEF**
Breach of Duty of Prudence of ERISA, as Amended
(Plaintiff, on behalf of himself and Class, Against Defendants – RKA Fees)

110. Plaintiff restates the above allegations as if fully set forth herein.

111. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

112. 29 U.S.C. § 1104(a)(1)(B) imposes a fiduciary duty of prudence upon Defendants in their administration of the Plan.

113. Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges objectively reasonable RKA fees.

114. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RKA fees were objectively reasonable; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

115. During the Class Period, Defendants breached their fiduciary duty of prudence to Plan participants, including to Plaintiff, by failing to: ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA.

116. During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper, Principal, to make sure it

was providing the recordkeeping services at reasonable costs, given the highly competitive market surrounding recordkeeping and the significant bargaining power the Plan had to negotiate the best fees, and remove the recordkeeper if it provided recordkeeping services at objectively unreasonable costs.

117. During the Class Period, Defendants breached their duty to Plan participants, including Plaintiff, by failing to employ a prudent process and by failing to evaluate the cost of the Plan's recordkeeper critically or objectively in comparison to other recordkeeper options.

118. Through these actions and omissions, Defendants breached their fiduciary duty of prudence with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(B).

119. Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

120. As a result of Defendants' breach of fiduciary duty of prudence with respect to the Plan, the Plaintiff and Plan participants suffered millions of dollars in objectively unreasonable and unnecessary monetary losses.

121. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Reynolds Plan the losses resulting from the breaches, to restore to the Plan any profits Defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this

Count. In addition, Defendants are subject to other equitable relief as set forth in the Prayer for Relief.

**SECOND CLAIM FOR RELIEF**
**Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class, Against Defendants – RKA Fees)**

122.   Plaintiff restates the above allegations as if fully set forth herein.

123.   Defendants had the authority to appoint, oversee, and remove members or individuals responsible for Plan RKA fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

124.   In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan recordkeeping fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

125.   Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

126.   The objectively unreasonable and excessive RKA fees paid by the Plan inferentially suggest that Defendants breached their duty to monitor by, among other things:

a.     Failing to monitor and evaluate the performance of individuals responsible for Plan recordkeeping fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonably RKA expenses;

b.     Failing to monitor the process by which the Plan's recordkeeper, Principal, was evaluated and failing to investigate the availability of more reasonably-priced recordkeepers; and

c.     Failing to remove individuals responsible for Plan recordkeeping fees whose performance was inadequate in that these individuals continued to pay the same RKA costs even though solicitation of competitive bids would have shown that maintaining Principal as the recordkeeper at the contracted price was imprudent, excessively costly, all to the detriment of the Plaintiff and Plan participants' retirement savings.

127.    As the consequences of the foregoing breaches of the duty to monitor for RKA fees, Plaintiff and Plan participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

128.    Pursuant to 29 U.S.C. §§1109(a) and 1132(a)(2), Defendants are liable to restore to the Reynolds Plan all loses caused by their failure to adequately monitor individuals responsible for Plan RKA fees. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

WHEREFORE, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.     A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.     Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.     A Declaration the Defendants are Plan fiduciaries have breached their fiduciary duties under ERISA;

D.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from paying unreasonable RKA fees, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligations;

E.     An Order requiring Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of constructive trust, or surcharge against Defendants as necessary to effectuate relief, and to prevent Defendants' unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of plan fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 16th day of September, 2022        **WALCHESKE & LUZI, LLC**

_s/ Paul M. Secunda_

James A. Walcheske
Paul M. Secunda
125 S. Wacker Dr., Suite 300
Chicago, Illinois 60606
Telephone: 224-698-2630
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com

_Counsel for Plaintiff_