IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

MICHAEL MAZZA individually, and as representative of a Class of Participants and Beneficiaries of the Pactiv Evergreen Services Inc. Employee Savings Plan,

    Plaintiff,

v.

PACTIV EVERGREEN SERVICES INC.

and

THE BOARD OF DIRECTORS OF PACTIV EVERGREEN SERVICES INC.,

    Defendants.

No. 1:22-cv-5052

Judge Sara L. Ellis

**MEMORANDUM IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Pactiv Evergreen Services, Inc. ("Pactiv") sponsors the Employee Savings Plan (the "Plan") to help its employees save for retirement. Plaintiff was a participant in the Plan from 2012 through 2018. The First Amended Complaint (the "Complaint")[1] alleges that the Plan paid excessive recordkeeping and administrative costs to Principal Life Insurance Company ("Principal"), which Plaintiff claims amounts to breach of fiduciary duty under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff's only other claim is a derivative failure to monitor claim brought against Pactiv and its Board of Directors.[2]

---

[1] Plaintiff's First Amended Complaint, at docket entry number 8, is cited in this brief as "FAC."

[2] The Complaint does not allege that the fees associated with the Plan's investments are excessive or that the investments offered by the Plan are imprudent due to the fee structure of such investments. Plaintiff also does not allege that the Plan failed to disclose its administrative fee structure to participants.

1

Plaintiff's excessive recordkeeping fee claim relies on the allegation that the Plan paid Principal more in fees than a cherry-picked list of sixteen alleged comparator plans out of approximately 600,0000 401(k) plans in existence.[3] Recently, the Seventh Circuit rejected a similar claim brought by the same counsel in *Albert v. Oshkosh Corp.*, 47 F.4th 570 (7th Cir. 2022). In *Albert*, the Seventh Circuit dismissed recordkeeping fee claims and confirmed that its prior precedent related to service provider claims remained unchanged despite the Supreme Court's decision in *Hughes v. Northwestern Univ.*, 142 S. Ct. 737 (2022). Specifically, the Seventh Circuit (1) reaffirmed its "rejection" of "the notion that a failure to regularly solicit quotes or competitive bids from service providers breaches the duty of prudence"; (2) reaffirmed its prior holdings that the "cheapest" option is not necessarily the best option under ERISA; and (3) with respect to excessive recordkeeping claims, held that a plaintiff must plausibly allege facts demonstrating that "fees were excessive relative to the services rendered," which the court described as a "context specific" inquiry. *Albert*, 47 F.4th at 575-82.

As explained more fully below, *Albert* compels dismissal here. Plaintiff alleges the same type of "random assortment" of comparator plans that the Seventh Circuit soundly rejected. Plaintiff's attempt to plead around *Albert* by generally alleging that every recordkeeper in the country performs the same scope and quality of services for every plan is contradicted by publicly available information and common sense. Accordingly, the Court should dismiss the Complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6).

---

[3] (FAC ¶¶ 80-81); *see* Investment Company Institute, *401(k) Resource Center (2022)*, https://www.ici.org/401k (last visited December 9, 2022) (estimating that there were 600,000 401(k) plans as of September 30, 2021).

I.  **FACTUAL BACKGROUND**[4]

    A.  **The Plan and Its Administrative Expense Structure**

The Plan is a defined contribution 401(k) plan regulated by ERISA. (FAC ¶ 30.) Pactiv is the sponsor of the Plan and serves as the Plan Administrator. (FAC ¶¶ 5, 28.) The Plan's participants include non-union employees of Pactiv and certain affiliates of Pactiv who have adopted the Plan. (Ex. 6, Audit at 5.)

Like other 401(k) plans, the Plan uses a variety of service providers to assist with the day-to-day operations of the Plan and to ensure compliance with Internal Revenue Code and ERISA regulatory requirements. Principal serves as the Plan's recordkeeper and third-party administrator. (FAC ¶ 6; *see also* Ex. 4, Audit at 6.) Crowe serves as the Plan's independent auditor. (Ex. 4, Sched. C at 3.) LPL Financial serves as the Plan's investment advisor. (*Id*.) Morningstar Investment Management LLC ("Morningstar") also provides participant-side advisory and acCount management services as part of the Principal Managed AcCount Program, which is explained below. (*Id*.) Principal receives payments from the Plan related to the services performed by Crowe, LPL Financial and Morningstar, and then administers payment to these service providers, which is reported as indirect compensation on Schedule C of the Plan's Form 5500. (*Id*.)

---

[4] The factual recitations in this brief are based on the allegations in the Complaint and the documents referred to in the Complaint. These allegations are taken as true as required by Fed. R. Civ. P. 12(b)(6) solely for purposes of this motion. On a Rule 12(b)(6) motion, the Court may consider the Plan's 404(a)(5) fee disclosures under ERISA, which were referred to in the Complaint. *See Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002) ("The cases therefore allow the defendant to submit the document [that is referenced in the complaint ] to the court, and the court to consider it, without need for conversion to Rule 56."); *Hecker v. Deere & Co.*, 556 F.3d 575, 582-83 (7th Cir. 2009) ("This court has been relatively liberal in its approach to the rule articulated in *Tierney* and other cases.") (collecting cases); *see also Patterson v. Morgan Stanley*, 2019 WL 4934834, at *11 (S.D.N.Y. Oct. 7, 2019) (considering plan fee disclosures that were referenced in the complaint).

The Plan pays for a variety of administrative expenses out of Plan assets as permitted by ERISA and the Plan's provisions. Administrative fees include recordkeeping and trustee fees and costs related to the services performed by Principal. (*Id.*) The Plan has provided participant fee disclosures as required by Section 404(a)(5) of ERISA to Plaintiff and all participants which explain all fees and costs in detail. (FAC ¶ 53.) During the 2018 Plan Year, for example, the disclosure stated that the Plan's core administrative expenses resulted in fees of $42.25 to each participant's acCount balance, one twelfth of which is deducted each month. (FAC ¶ 53; *see also* Gonzales Decl. Ex. 1, Ex. C at 2.) This fixed fee amount per participant includes recordkeeping, participant website services, participant statements, plan compliance services, and professional financial services. *Id.*; *see also* (FAC ¶ 40.)

Principal also performs other administrative services, which the Complaint refers to as "Ad Hoc" services, that have "separate, additional fees based on the conduct of individual participants." (FAC ¶ 41.) These services include participant loans, distributions, qualified domestic relations order review and processing, and hardship withdrawal services. (*See* Gonzales Decl. Ex. 1, Ex. C at 3; FAC ¶ 41.) For example, during the 2018 Plan Year, these additional services had the following additional fee structure:

| SERVICE | FEE |
|---|---|
| Distribution fee | $40.00 |
| Loan Setup fee | $50.00 |
| QDRO review fee | $220 per hour for each QDRO reviewed |
| QDRO processing fee | $350.00 per QDRO |
| Enhanced Hardship Withdrawal Fee | $80.00 |

*Id.*

Principal also receives "revenue sharing" from some of the investments in the Plan. (FAC ¶¶ 57-58.) Revenue sharing is "an arrangement allowing mutual funds to share a portion of the

4

fees that they collect from investors with entities that provide services to the mutual funds," like recordkeepers. *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907-08 (7th Cir. 2013). Accordingly, a portion of the total investment expense of the Plan's investments may be shared with Principal as compensation for recordkeeping services performed by Principal that would otherwise be performed by the investment fund at issue. (*See* Gonzales Decl. Ex. 1, Ex. C at 2.) All revenue sharing received by Principal is credited back in full to the impacted participant as a "Fee Adjustment" on a monthly basis, thereby defraying the administrative costs to Plan participants. (*Id.*)

During Plan Years 2017 through 2021, the Plan also allowed participants to voluntarily participate in the Principal Managed AcCount Program.[5] This program allows participants to receive professional advisory and acCount management services from Morningstar specific to their goals and risk tolerance. Gonzales Decl. Ex. 1, Ex. C at 3. The fee for this service is based on a percentage of the participant's balance as of the last day of each quarter. Fees for Principal's Managed AcCount Program are charged by Principal to individual participants' accounts, and Principal then pays fees to Morningstar to provide investment advisory services directly to participants on a fiduciary basis. (Ex. 4, Sched. C at 4; *see also* Gonzales Decl. Ex. 1, Ex. C at 3-4.)

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). In making this determination, the court must engage in a "context-specific" review that "requires the . . . court to

---

[5] Gonzales Decl. Ex. 1, Ex. B at 2; Ex. C at 2-3; Ex. D at 3; Ex. E at 3; Ex. F at 3.

draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. Although the court must accept all well-pleaded facts as true and draw all reasonable inferences in the plaintiff's favor, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. Additionally, well pleaded facts that are consistent with both legal and illegal conduct are insufficient to cross "the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680.

In the context of putative ERISA class actions, "Rule 12(b)(6) motions are an 'important mechanism for weeding out meritless claims.'" *Albert*, 47 F.4th at 577 (citing *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)). The complaint must plausibly allege that the defendant failed to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use." *Albert*, 47 F.4th at 574 (citing 29 U.S.C. § 1104(a)(1)(B)). In reviewing ERISA claims, the court must "apply a 'careful, context-sensitive scrutiny [to] a complainant's allegations' to 'divide the plausible sheep from the meritless goats.'" *Id*. at 577 (quoting *Dudenhoeffer*, 573 U.S. at 425). In so doing, the court must recognize that "[t]he circumstances facing an ERISA fiduciary will implicate difficult tradeoffs," and as a result, "courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise." *Id*. (quoting *Hughes,* 142 S. Ct. at 742).

### III. ARGUMENT

#### A. Count I Fails to Allege a Plausible Claim for Relief under Binding Seventh Circuit Precedent

As explained more fully below, the Court should dismiss Count I because Plaintiff relies on the same defective theories and comparisons that the Seventh Circuit rejected in *Albert*.

Plaintiff's conclusory pleading fails to meet *Albert*'s "context specific" standard for recordkeeping claims and, therefore, the Court should dismiss Count I.

### 1. ERISA Does Not Require that a Fiduciary Engage in Competitive Bidding to Ensure Fees Are Reasonable

First, Plaintiff reiterates the same process-based theory that was rejected as legally insufficient in *Albert*. Namely, the Complaint alleges that Pactiv breached its duty of prudence by failing to solicit competitive bids from other recordkeepers, which Plaintiff claims would be lower based on the sixteen comparator plans identified in the Complaint out of the thousands of plans that file Form 5500s each year. (FAC ¶¶ 70, 74-75.) In *Albert*, the Court directly rejected the concept that "a failure to regularly solicit quotes or competitive bids" for recordkeeping services breaches the duty of prudence. 47 F.4th at 579 (citing *Divane v. Northwestern Univ.*, 953 F.3d 980, 990-91 (7th Cir. 2020)); *see also Baumeister v. Exelon Corp.,* 2022 WL 4477916, at *2 (N.D. Ill. Sept. 22, 2022) (dismissing a similar complaint filed by the same plaintiff's counsel alleging failure to solicit competitive bids from recordkeepers). Consistent with *Albert*, the Court should find that the Complaint fails to plausibly allege that Defendants breached their duty of prudence by not soliciting quotes or competitive bids to identify lower cost providers.

### 2. The Court Should Reject Plaintiff's Price Tag Comparison to a "Random Assortment" of Plans under *Albert*

The Court should also reject Plaintiff's comparison to a cherry-picked sampling of plans, which he claims paid lower fees than the Plan paid to Principal. In *Albert*, the Seventh Circuit rejected the same type of comparison to a "random assortment" of plans that Plaintiff uses here. 47 F.4th at 579. The Seventh Circuit held that it "has repeatedly emphasized that the cheapest investment option is not necessarily the one a prudent fiduciary would select." *Id*. (citing *Loomis v. Exelon Corp.*, 658 F.3d 667, 670 (7th Cir. 2011) ("nothing in ERISA requires every fiduciary to scour the market to find and offer the cheapest possible fund . . . .") (quoting *Hecker*, 556 F.3d at

7

586)); *see also* (Dep't of Labor, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan*, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (last visited December 9, 2022) ("Cost is only one factor to be considered in selecting a service provider."). Indeed, fiduciaries have no duty to find the least expensive option "which might, of course, be plagued by other problems." *Hecker*, 556 F.3d at 586. Instead, ERISA requires that fiduciaries defray *reasonable* expenses of administering the plan. 29 U.S.C. § 1104(a)(1)(A). The Complaint assumes that cheaper is always better, but cheap is not a proxy for reasonable under ERISA. *Loomis*, 658 F.3d at 670; *see* (FAC ¶ 43) ("The cheaper you can find competent custody and recordkeeping services, the better for participants."). Moreover, Plaintiff does not even allege that the fees in question are higher than the *average* amount paid by the average plan participant; just that the fees are allegedly higher on a per participant basis when compared to *sixteen* of hundreds of thousands of 401(k) plans.

Here, the plans Plaintiff chose for comparison from thousands range from 8,097 participants to almost 20,000. (FAC ¶ 81.) The amount of assets of these sixteen plans ranges from $321,945,688 to over $2 billion. (*Id*.) This wide range of plan characteristics alone calls into question the plausibility of how these plans were selected for comparison. *See Mator v. Wesco Distrib., Inc.*, 2022 WL 3566108, at *8 (W.D. Pa. Aug. 18, 2022) (noting that "[s]uch disparities [in plan participants and assets] raise serious doubt as to plausibility of how the purported comparator plans are indeed comparable.") Under *Albert*, the alleged recordkeeping and fee ratio from a small sampling of plans cherry-picked by Plaintiff cannot create a reasonable inference that the Plan's recordkeeping and administrative fees were outside of the reasonable range of judgments that a prudent fiduciary could make. 47 F.4th at 579.

### 3. Plaintiff Fails to Plead Facts which Plausibly Establish that Principal's Fees Were Unreasonable Relative to the Services Provided

The Complaint fails to allege facts which plausibly show that Plan's recordkeeping and administrative fees are excessive "*relative to the services rendered*," as required by *Albert*. *Id.* at 580 (citing *Smith v. CommonSpirit Health*, 37 F.4th 1160, 1169 (6th Cir. 2022) (emphasis added)). Plaintiff attempts to plead around *Albert* by alleging that every recordkeeper in the United States provides "nearly identical" services for every 401(k) plan (FAC ¶ 52), and that Principal provides the same "level and quality of services" as those provided to the sixteen comparator plans by other service providers. (FAC ¶¶ 81-82, 90-92.) These conclusory allegations should be disregarded, however, because they are wholly unsupported by factual averments specific to the Plan or any of the comparator plans identified in the Complaint.

Plaintiff's assertion that every recordkeeper in the United States performs *identical* recordkeeping services at *identical* quality levels to thousands of different plans fails to meet the pleading standard in *Albert*. (FAC ¶¶ 39-43.) Indeed, the Seventh Circuit's holding in *Albert* that plaintiffs must plead facts showing that recordkeeping fees were unreasonable "relative to services rendered" would be unnecessary if every recordkeeper in the country performed the exact same services for every plan at the exact same quality level. *Albert*, 47 F.4th at 580. Moreover, the complaint in *Albert* was brought by the same plaintiff's counsel and included similar conclusory allegations that recordkeepers provide the same services for lower fees. *Id.*; *see also* Am. Compl. ¶¶ 72, 111, *Albert v. Oshkosh Corp.*, 2021 WL 3932029, at *1 (E.D. Wis. Sept. 2, 2021), aff'd, 47 F.4th 570 (7th Cir. 2022), reh'g denied, 2022 WL 4372363 (7th Cir. Sept. 21, 2022). Accordingly, *Albert* forecloses Plaintiff's attempt to plead relative services rendered by simply claiming that every recordkeeper and third-party administrator performs the exact same services at the exact same quality level.

Plaintiff's conclusory allegation that the services provided by Principal are the same as those provided to the comparator plans is contradicted by the Form 5500s referenced in the Complaint. (FAC ¶ 92.) For example, many of the alleged comparator plans indicate that the plan sponsor performs and/or pays for recordkeeping and administrative functions that are not charged to the comparator plan.[6] At least one plan indicates that the plan sponsor pays for *the majority* of the plan's recordkeeping and administrative expenses at no cost to the plan.[7] Obviously, if some or a majority of recordkeeping or administrative services are being performed or paid for by the plan sponsor, any attempt to claim that the fees disclosed on the Form 5500 are for the same scope and quality of services is not plausible. Similarly, several of the service providers identified also reported a wide array of services codes not listed by Principal (including "investment management," "consulting" and "float revenue"), which further demonstrates that the identified providers are not performing the same scope of services.[8] *See Mator*, 2022 WL 3566108, at *5-8 (holding that a difference in service codes demonstrates the lack of appropriate comparison between service provider fees reported on Form 5500).

---

[6] Ex. 8, Audit at 11 (noting that the plan sponsor provides certain "administrative and accounting services" and pays for audit expense); Ex. 9, Audit at 4 ("certain other administrative expenses, such as legal, recordkeeping, and accounting services are provided at the expense of the Company."); Ex. 10, Audit at 9 (stating that the plan sponsor pays for certain administrative costs of the plan, which are excluded from the plan's financial statements).

[7] Ex. 11, Audit at 8 ("majority" of administrative expenses paid for by the plan sponsor); Ex. 12, Audit at 8 (noting that certain expenses of maintaining the plan are paid directly by the plan sponsor and that "administrative expenses" includes only certain recordkeeping and note receivable costs charged to participant accounts).

[8] *Compare* Gonzales Decl. Ex.1, Ex. C, Sched. C at 3 (listing service codes 13, 37, 50, 64), *with*, Ex. 9, Sched. C at 3, (listing service codes 37, 60, 64, 65); Ex. 10, Sched. C at 3 (listing service codes 15, 21, 25, 28, 33, 37, 38, 49, 50, 52, 55, 57, 59, 62, 64, 65); Ex. 13, Sched. C at 3 (listing service codes 37, 38, 50, 60, 64, 65); Ex. 8, Sched. C at 3 (listing service codes 15, 25, 37, 52); Ex. 12, Sched. C at 3 (listing service code 64 [recordkeeping fees] only); Ex. 14, Sched. C at 3 (listing service codes 37, 64, 65, 71); Ex. 11, Sched. C at 3 (listing service codes 15, 16, 25, 37, 52); *see also* U.S. Dept. of Labor, *Instructions for Form 5500* (https://www.dol.gov/sites/dolgov/files/ebsa/employers-and-advisers/plan-administration-and-compliance/reporting-and-filing/form-5500/2021-instructions.pdf), p. 29) (last visited December 9, 2022) (explaining service codes).

Not only does Plaintiff's claim run afoul of the core assumption in *Albert* that recordkeepers may vary in terms of scope and quality of services, but Plaintiff's conclusory pleadings also defy common sense. For example, if Plaintiff's allegations were correct, it would be unnecessary for the U.S. Department of Labor to instruct fiduciaries to consider the scope of services of such providers when considering fee structures. *See* U.S. Dep't of Labor, *Tips for Selecting and Monitoring Service Providers for Your Employee Benefit Plan*, https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/tips-for-selecting-and-monitoring-service-providers.pdf (last visited December 9, 2022) (instructing fiduciaries to "[a]sk each prospective provider to be specific about which services are covered for the estimated fees and which are not"). Even Plaintiff acknowledges that a fiduciary can negotiate with recordkeepers to "provide the same (or better) level and qualities of services," contradicting the allegation that the quality of all such services is identical. (FAC ¶ 69.)

Plaintiff's attempt to meet *Albert*'s pleading standard by sprinkling the words "same or similar services" throughout the Complaint also fails, particularly when none of those plans actually use Principal for recordkeeping or administrative services. (FAC ¶¶ 81-82, 90-92.) The Complaint fails to allege what specific services Principal performs for the Plan and what specific services the comparator plans received, let alone the relative quality of the services rendered. For example, Plaintiff fails to address the fact that the Plan offered a Managed AcCount Program administered by Principal, which is not included in the generalized description of "Bundled RKA" or "Ad Hoc" services referenced in the Complaint. (FAC ¶¶ 40-44.) This additional scope of services increases Principal's direct compensation reported on the Plan's Form 5500 in an amount that varies based on the number of participants who elect to participate in that program in a given plan year. *See supra,* at n.5. While Plaintiff subtracts flow-through compensation to service

11

providers Crowe and LPL Financial, Plaintiff's "Est RKA Fees" calculated in Paragraph 80 of the Complaint include payments made to Principal related to the Managed AcCount Program, a portion of which are then paid out to Morningstar for the provision of participant advisory and management services. (Ex. 4, Sched. C.)[9] Plaintiff makes no attempt to remove these fees from his calculation of "Est RKA Fees" or to allege that all comparator plans offer this same managed acCount service, which further undermines any plausible claim that the comparator plans represent anything close to an apples to apples comparison. *See Mator*, 2022 WL 3566108, at *5-8.

The Eastern District of Wisconsin recently addressed similar allegations in *Glick v. Thedacare Inc.*, which considered and rejected the plaintiff's "random assortment" of comparator plans. 2022 WL 16927749, at *3 (E.D. Wisc. Oct. 27, 2022), *report and recc'd adopted by* 2022 WL 16924188 (E.D. Wisc. Nov. 14, 2022). In dismissing plaintiff's recordkeeping claims, the court held that "the complaint [did] not contain any allegations concerning the *specific services* performed by the comparator plans' recordkeepers or any allegations supporting a plausible inference that the plan's recordkeeping services were equivalent to those provided by the comparator plans." *Id.* (emphasis in original). Similarly, the Western District of Pennsylvania dismissed a complaint in *Mator* that contained similar conclusory allegations that alleged comparator plans performed "identical or similar services," including generalized allegations that all recordkeepers perform the same services at the same quality level. *See Mator*, 2022 WL 3566108, at *5-8 ("without pleading additional details as to fee structures and services provided, [the complaint] only infers a possibility but not a plausibility that Defendants acted imprudently.").

---

[9] *Compare* (FAC ¶ 80), *with* (Ex. 4, Sched. C.) Plaintiff's calculation of "Est. RKA Fees" of $846,679 in 2018 is derived by taking the total direct compensation disclosed as to Principal ($907,279) and subtracting the investment advisory fees paid to LPL Financial ($33,100), and audit fees paid to Crowe ($27,500) ($907,279 - $33,100 – $27,500 = $846,679). However, Plaintiff makes no attempt to subtract out flow-through compensation paid by Principal to Morningstar. *See* (Ex. 4, Sched. C at 3-5.)

Just as it is implausible to suggest that AT&T, T-Mobile and Sprint charge the same fees without regard to any individual differences in the services provided, it is implausible to suggest that Principal, Fidelity and Vanguard do the same. For these same reasons, the Court should disregard Plaintiff's conclusory allegations and hold that Plaintiff fails to plead facts that show that Principal's fees were excessive relative to the services it offered.

### 4. Plaintiff Fails to Allege Any Facts to Plausibly Support His Allegation that Principal's Services Are the Same Quality as All Other Providers

Further emphasizing the court's reasoning in *Albert*, Plaintiff makes no attempt to plead actual facts to support his conclusory allegation that Principal's services are the "same or similar" *quality* as those of every other recordkeeping and third-party administrator. (FAC ¶¶ 81-82, 90-92.) As explained in prior Seventh Circuit caselaw, DOL guidance, and Plaintiff's own Complaint, the quality of services rendered is one of several trade-offs a fiduciary may consider when selecting a service provider. *Albert*, 47 F.4th at 580 (requiring "context-sensitive" pleading "relative to services rendered."); *Hughes*, 142 S. Ct. at 742 (". . .the circumstances facing an ERISA fiduciary will implicate difficult tradeoffs, and courts must give due regard to the range of reasonable judgments a fiduciary may make based on her experience and expertise."); *see also* U.S. Dept. of Labor Employee Benefits Security Administration (EBSA), *Meeting Your Fiduciary Responsibilities*, https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/meeting-your-fiduciary-responsibilities.pdf (last visited Dec. 9, 2022) [10].

While Plaintiff attempts to claim that all recordkeepers perform the same scope of services, the failure to allege facts addressing the *quality* of those services renders Plaintiff's comparisons even more meaningless. *See Mator*, 2022 WL 3566108, at *7 ("Plaintiffs purported side by side

---

[10] This publication is in PDF format and bears a watermark.

comparison does not acCount for the quality of services. Such allegations are too generalized and speculative to move into the realm of the plausible."). The list of core services referenced in the Complaint at Paragraph 40 only serves to illustrate this point. "Transaction processing" and "web acCount access" for example may vary from one provider to the next, as every consumer of services knows that one company's website platform and execution is not the same quality as the next. (FAC ¶ 40, b-c.) "Participant communications" is also an extremely broad service category and execution and quality of communications at the micro or macro level to participants may vary widely in quality. (*id*. at d.) Does the recordkeeper or third-party administrator provide a dedicated acCount representative, or does participant and/or sponsor support need to go through a 1-800 number? Are plan documents, summary plan descriptions or other materials provided in "cookie cutter" format, or are they drafted and customized for the specific features of the plan and for the demographics of the participant community? How many and what type of "employee meetings" does the provider offer? These are all legitimate and perhaps determinative considerations for a fiduciary to consider in addition to price. Plaintiff's failure to plead any specific facts which address the relative quality of services provided *to this Plan* further supports dismissal of the Complaint.

    **B.**  **Count II Fails Because It Is Wholly Dependent on the Success of Count I**

    Count II alleges that the "objectively unreasonable and excessive" fees paid by the Plan "inferentially suggest" that Defendants breached their duty to monitor those responsible for ensuring that the Plan's recordkeeping fees were reasonable. (FAC ¶ 128.) Plaintiff's derivative claim, and the conclusory allegations upon which it is based, fails on its face because the Complaint fails to plausibly allege an underlying fiduciary breach in Count I. *See Rogers v. Baxter Int'l Inc.*, 710 F. Supp. 2d 722, 740 (N.D. Ill. 2010) ("several courts have held that a failure to monitor claim

14

is derivative in nature and must be premised an underlying breach of fiduciary duty") (citations omitted); *Osborne v. Employee Benefits Admin. Bd. of Kraft Heinz*, 2021 WL 3725613, at *5 (N.D. Ill. Aug. 23, 2021) ("Plaintiffs cannot maintain a claim for breach of the duty to monitor . . . absent an underlying breach of the duties imposed under ERISA by the Plan Committee Defendants.") (internal quotation marks omitted; collecting cases). For this reason, Count II also must be dismissed. *See Albert*, 47 F.4th at 583 ("Because we affirm the dismissal of [plaintiff's] fiduciary duty claims, [his derivative] claims must fail as well."); *Glick*, 2022 WL 16927749, at *6 ("Because I recommend the court dismiss Glick's duty of prudence claims, I recommend the duty to monitor claims be dismissed as well.").

### IV. CONCLUSION

At bottom, this case presents the same myopic comparison of a plan's administrative services to a "random assortment" of plans with alleged lower fee ratios that the Seventh Circuit concluded fails to allege a plausible theory of fiduciary breach. As explained above, *Albert* compels dismissal in this case. Plaintiff's attempt to meet *Albert*'s pleading standard by claiming every recordkeeper and third-party administrator in the United States performs exactly the same services at the same quality to every plan should be rejected. Plaintiff fails to plead actual facts showing a plausible claim that the Plan's fees were unreasonable relative to the specific services rendered to the Plan, and should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

VP/#59083607

## CERTIFICATE OF SERVICE

      I hereby certify that a true and correct copy of the foregoing *Memorandum in Support of Defendant's Motion to Dismiss Plaintiff's First Amended Complaint* was served upon the following counsel of record via U.S. mail on this 9th day of December, 2022. Notice of this filing will be sent to the following counsel of record via U.S. mail and by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

**Counsel for Plaintiff**

James A. Walcheske
Paul M. Secunda
Walcheske & Luzi, LLC
125 S. Wacker Dr. | Suite 300
Chicago, IL 60606
Telephone: (224) 698-2630
jwalcheske@walcheskeluzi.com
psecunda@walcheskeluzi.com

                                                         */s/ Patrick Spangler*
                                                 Patrick Spangler #6290810
                                                 Michelle Olson #6302687
                                                 Vedder Price P.C.
                                                 222 North LaSalle Street
                                                 Chicago, IL 60601-1003
                                                 Telephone: (312) 609-7500
                                                 Facsimile: (312) 609-5005
                                                 pspangler@vedderprice.com
                                                 molson@vedderprice.com

VP/#59083607