UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MICHAEL MAZZA, individually, and as Representative of a Class of Participants and Beneficiaries of the Pactiv Evergreen Services Inc. Employee Savings Plan, <br><br> Plaintiff, <br><br> v. <br><br> PACTIV EVERGREEN SERVICES INC. and THE BOARD OF DIRECTORS OF PACTIV EVERGREEN SERVICES INC., <br><br> Defendants. | No. 22 C 5052 <br><br> Judge Sara L. Ellis |

**OPINION AND ORDER**

Plaintiff Michael Mazza, a former participant in the Pactiv Evergreen Services Inc. Employee Savings Plan (the "Plan") that Defendant Pactiv Evergreen Services Inc. ("Pactiv") sponsors,[1] filed this purported class action lawsuit under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, against Pactiv and its Board of Directors (the "Director Defendants"). In his amended complaint, Mazza complains that Defendants breached their fiduciary duty of prudence by causing Plan participants to pay excessive recordkeeping and administrative ("RKA") fees and that they failed to adequately monitor other Plan fiduciaries. Defendants have moved to dismiss Mazza's amended complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). Because Mazza has sufficiently alleged his claims, the Court denies Defendants' motion.

---

[1] From January 1, 2016 to November 24, 2019, Reynolds Services Inc. ("Reynolds") sponsored the Plan. After a spinoff, on November 25, 2019, Reynolds' successor, Pactiv, became the Plan sponsor.

## BACKGROUND[2]

Pactiv provides household products, including preparation, cooking, cleanup, and storage solutions. Pactiv sponsors and provides employees with a § 401(k) defined contribution pension plan, Pactiv Evergreen Services Inc. Employee Savings Plan (the "Plan"). Pactiv matched employees' contributions to the Plan. Pactiv's contributions to the payment of Plan costs are guaranteed but pension benefits are not. Instead, the market performance of participants' contributions less expenses determines the value of participants' investments. Pactiv serves as the Plan Administrator. Pactiv and the Director Defendants serve as ERISA fiduciaries, exercising discretionary oversight, authority, or control over the Plan.

Mazza began working at Reynolds, Pactiv's predecessor, in June 2012 as the director of marketing. When he left Reynolds' employment in July 2018, he held the role of senior director of marketing. Mazza is a former Plan participant, having held investments in target date funds, international funds, bond funds, and small cap funds through the Plan.

Fiduciaries of mega 401(k) defined contribution plans, like the Plan here, hire recordkeepers to provide bundled service offerings to the plans. All recordkeepers servicing mega plans deliver essentially the same RKA services of the same level and quality, regardless of the specific service plans listed on their Form 5500s. Recordkeepers typically provide plans with Bundled RKA services, a "buffet style level of service," as part of a bundled fee. Doc. 8 ¶ 40. These Bundled RKA services include recordkeeping, transaction processing, administrative services related to converting a plan from one recordkeeper to another, participant

---

[2] The Court takes the facts in the background section from Mazza's amended complaint and presumes them to be true for the purpose of resolving Defendants' motion to dismiss. *See Phillips v. Prudential Ins. Co. of Am.*, 714 F.3d 1017, 1019–20 (7th Cir. 2013). Although the Court normally cannot consider extrinsic evidence without converting a motion to dismiss into one for summary judgment, *Jackson v. Curry*, 888 F.3d 259, 263 (7th Cir. 2018), the Court may consider "documents that are central to the complaint and are referred to in it" in ruling on a motion to dismiss, *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

communications, maintenance of an employer stock fund, plan document services, plan consulting services such as assistance in selecting the investments offered to participants, accounting and audit services, compliance support, and compliance testing. Recordkeepers also may offer plans Ad Hoc RKA services, which have separate, additional fees based on participants' conduct and usage of those services. Ad Hoc RKA services include loan processing, brokerage services and account maintenance, distribution services, and processing of qualified domestic relations orders. Recordkeepers mainly earn their fees from providing Bundled RKA services, not Ad Hoc RKA services. Recordkeepers may also perform certain RKA services on behalf of investment managers. In exchange, recordkeepers may collect a portion of the total expense ratio fee for the specific investment in a practice called revenue sharing or indirect compensation.

Recordkeeping fees are relatively stable and did not materially change for mega plans during the class period. The underlying cost to recordkeepers of providing recordkeeping services primarily depends on the number of participant accounts in a plan, not the plan's total assets. Thus, recordkeepers typically quote their fees for Bundled RKA services on a per participant basis, without accounting for any individual differences in services requested. The minor variations in the level and quality of Bundled RKA services have little to no material impact on the fees the recordkeepers charge, with virtually all recordkeepers providing the same core services. Indeed, industry experts, and even Fidelity, a top recordkeeper, have maintained at least since 2016 that Bundled RKA services "are a commodity with little variation in price." *Id.* ¶ 43. In other words, "[t]he cheaper you can find competent custody and recordkeeping services, the better for participants." *Id.*

The Plan uses Principal Life Insurance Company ("Principal") as its recordkeeper and third party administrator. Principal provides the Plan with a standard level of Bundled RKA services that is "of a nearly identical level and quality" as other recordkeepers servicing mega plans. *Id.* ¶ 52. The Plan's 2018 Section 404(a)(5) disclosure indicated that the Plan charged participants an annual administrative expense of $42.25, with administrative expenses "typically includ[ing] items such as recordkeeping, participant website, participant statements, Plan compliance services and financial professional services." Doc. 17-4 at 2. The Plan did not disclose anything to suggest that the annual administrative fee it charged participants included any unusual services or services above and beyond standard recordkeeping and administrative services. The Plan did disclose that Ad Hoc services and participation in the Principal Managed Account Program would incur additional fees. The Plan also paid Principal revenue sharing, which it disclosed in its Form 5500s and Section 404(a)(5) disclosures, further indicating that "[a]ny revenue sharing received from the Plan's investment options will be credited back in full to the impacted participant as a Fee Adjustment on a monthly basis." Doc. 17-4 at 2.

In 2020, the Plan had approximately $879,161,567 in assets, more assets than 99.78% of the defined contribution plans that filed Form 5500s for that year. That same year, it had 10,205 participants, more participants than 99.82% of the defined contribution plans that filed Form 5500s for that year. This gave the Plan substantial bargaining power over Plan fees and expenses.

The following table provides the number of participants in the Plan and the Plan's RKA fees between 2016 and 2020:

**Recordkeeping and Administration (RKA) Fees**

|  | 2016 | 2017 | 2018 | 2019 | 2020 | *Average* |
|---|---|---|---|---|---|---|
| Participants | 12,619 | 13,294 | 13,770 | 10,870 | 10,205 | *12,152* |
| Est. RKA Fees | $852,638 | $819,477 | $846,679 | $895,374 | $725,617 | *$827,957* |
| Est. RKA Per Participant | $68 | $62 | $61 | $82 | $71 | *$68* |

Doc. 8 ¶ 80. Comparable plans receiving the same services of the same level and quality as the Plan received from Principal paid the following RKA fees:

**Comparable Plans' RKA Fees Based on Publicly Available Information from Form 5500 (Price Calculations are based on 2018 Form 5500 or most recent if 2018 not available)**

| Plan | Participants | Assets | RKA Fee | RKA Fee /pp | Recordkeeper |
|---|---|---|---|---|---|
| The Boston Consulting Group, Inc. Employees' Savings Plan And Profit Sharing Retirement Fund | 8,067 | $894,454,060 | $336,660 | $42 | Vanguard |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,902 | $904,717,349 | $322,496 | $36 | Fidelity |
| Children's Medical Center Of Dallas Employee Savings Plan 403(B) | 9,356 | $349,335,673 | $337,416 | $36 | Fidelity |
| Ralph Lauren Corporation 401(K) Plan | 9,389 | $552,586,935 | $290,066 | $31 | T. Rowe Price |
| Vibra Healthcare Retirement Plan | 9,750 | $107,652,510 | $277,532 | $28 | Great-West |
| Republic National 401(K) Plan | 9,922 | $671,989,837 | $324,171 | $33 | Great-West |
| S Ca Permanente Medical Group Tax Savings Retirement Plan | 10,770 | $773,795,904 | $333,038 | $31 | Vanguard |
| Employee Savings Plan Average Fee | 12,152 | $933,346,984 | $827,957 | $68 | Principal |
| Viacom 401(K) Plan | 12,196 | $1,249,874,734 | $376,314 | $31 | Great-West |
| Sutter Health Retirement Income Plan | 13,248 | $406,000,195 | $460,727 | $35 | Fidelity |
| Fortive Retirement Savings Plan | 13,502 | $1,297,404,611 | $472,673 | $35 | Fidelity |

5

| | | | | | |
|---|---|---|---|---|---|
| Michelin Retirement Account Plan | 13,798 | $616,026,001 | $425,270 | $31 | Vanguard |
| Dollar General Corp 401(k) Savings and Retirement Plan | 16,125 | $355,768,325 | $635,857 | $39 | Voya |
| Michelin 401(K) Savings Plan | 16,521 | $2,380,269,826 | $570,186 | $35 | Vanguard |
| Fedex Office And Print Services, Inc. 401(K) Retirement Savings Plan | 17,652 | $770,290,165 | $521,754 | $30 | Vanguard |
| Pilgrim's Pride Retirement Savings Plan | 18,356 | $321,945,688 | $486,029 | $26 | Great-West |
| JBS 401(K) Savings Plan | 19,420 | $374,330,167 | $481,539 | $25 | Great-West |

*Id.* ¶ 81. Based on this information, a hypothetical prudent plan fiduciary would have paid on average an effective annual RKA fee of around $32 per participant between 2016 and 2020, or approximately $388,841 per year in RKA fees total. In other words, the Plan cost its participants on average an additional $439,106 per year (or approximately $36 per participant per year) in RKA fees between 2016 and 2020, totaling $2,195,529. Defendants did not regularly reassess the Plan's Bundled RKA fees that it paid to Principal during the class period, solicit quotes from other recordkeepers, or perform competitive comparisons of the Bundled RKA fees.

## LEGAL STANDARD

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. Fed. R. Civ. P. 12(b)(6); *Gibson v. City of Chicago*, 910 F.2d 1510, 1520 (7th Cir. 1990). In considering a Rule 12(b)(6) motion, the Court accepts as true all well-pleaded facts in the plaintiff's complaint and draws all reasonable inferences from those facts in the plaintiff's favor. *Kubiak v. City of Chicago*, 810 F.3d 476, 480–81 (7th Cir. 2016). To survive a Rule 12(b)(6) motion, the complaint must assert a facially plausible claim and provide fair notice to the defendant of the claim's basis. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 555 (2007); *Adams v. City of Indianapolis*, 742 F.3d 720, 728–29 (7th Cir. 2014). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## ANALYSIS

### I.  Breach of the Duty of Prudence

ERISA's duty of prudence requires a plan fiduciary to "discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The duty of prudence includes a continuing duty to monitor investments. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015). Fiduciaries also must "incur only costs that are reasonable in amount and appropriate to the investment responsibilities of the trusteeship." *Hughes v. Nw. Univ.*, 63 F.4th 615, 627 (7th Cir. 2023) (quoting *Tibble v. Edison Int'l*, 843 F.3d 1187, 1197 (9th Cir. 2016)). "To plead a breach of the duty of prudence under ERISA, a plaintiff must plausibly allege fiduciary decisions outside a range of reasonableness." *Id.* at 630. To determine if a plaintiff's complaint passes muster, the Court must conduct a "careful, context-sensitive scrutiny of a complaint's allegations to divide the plausible sheep from the meritless goats." *Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022) (quoting *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 425 (2014)).

Mazza alleges that Defendants breached the duty of prudence by failing to ensure the reasonableness of the Plan's RKA fees and failing to monitor and evaluate Principal's costs in comparison to other recordkeeper options. Defendants respond that the Seventh Circuit's

decision in *Albert*, 47 F.4th 570, requires the dismissal of Mazza's claim. In *Albert*, the Seventh Circuit affirmed the dismissal of the plaintiff's excessive RKA fee claim, which relied on a price comparison of RKA fees charged to various plans. *Id.* at 579–80. The court emphasized that the plaintiff did not provide allegations that suggested that the plan's charged RKA "fees were excessive in relation to the services provided." *Id.* at 580. But the court left the door open to future recordkeeping claims "surviv[ing] the 'context-sensitive scrutiny of a complaint's allegations' courts perform on a motion to dismiss." *Id.*

In the Seventh Circuit's most recent decision in *Hughes*, the Seventh Circuit distinguished *Albert* and found that the plaintiffs provided the required context to allege that their plan's RKA fees "were excessive relative to the recordkeeping services rendered." 63 F.4th at 632. This context included allegations that "the quality or type of recordkeeping services provided by competitor providers are comparable to that provided by Fidelity and TIAA," that "recordkeeping services are fungible and that the market for them is highly competitive," and that "$35 per participant was a reasonable recordkeeping fee based on the services provided by existing recordkeepers and the Plans' features." *Id.* The court also noted that plaintiffs had "provide[d] examples of several other university I.R.C. § 403(b) plans that successfully reduced recordkeeping fees by soliciting competitive bids, consolidating to a single recordkeeper, and negotiating rebates," and that Northwestern had "successfully lowered the Plans' administrative fees (including recordkeeping fees) in the October 2016 restructuring, which suggests that Northwestern's recordkeeping fees were unreasonably high and that means to lower such fees were available." *Id.* at 632 (footnote omitted). The court specifically rejected the defendant's argument that a plaintiff would have to "prove that another recordkeeper would have offered a lower fee" in order to proceed past a motion to dismiss. *Id.* at 633.

8

Although a close question, Mazza's allegations align more closely with those the Seventh Circuit allowed to proceed in *Hughes* than those it rejected in *Albert*. Initially, the Court acknowledges that Defendants' alleged failure to regularly solicit quotes or competitive bids on its own does not amount to a breach of the duty of prudence. *Id.* at 625–26 ("We reaffirm that a fiduciary need not constantly solicit quotes for recordkeeping services to comply with its duty of prudence."). But Mazza alleges more than that, and, as *Hughes* recognized, "fiduciaries who fail to monitor the reasonableness of plan fees and fail to take action to mitigate excessive fees—such as by adjusting fee arrangements, soliciting bids, consolidating recordkeepers, negotiating for rebates with existing recordkeepers, or other means—may violate their duty of prudence." *Id.* at 626. Mazza's amended complaint includes allegations that recordkeepers for mega retirement plans like Pactiv's all provide the same level and quality of services with insignificant variation in price, suggesting that the Plan's RKA fees were excessive compared to the services the Plan received based on comparisons to other plans using recordkeepers that provided comparable services for less. Following *Hughes*, these allegations suffice to allege a breach of the duty of prudence. *See id.* at 633 ("[U]nder the pleading standard, plaintiffs have sufficiently alleged that recordkeeper consolidation and soliciting an equally capable but lower-cost recordkeeper were available options. Plaintiffs point to other institutions that had successfully consolidated and reduced fees. And they maintain that the market is competitive with equally capable recordkeepers who can provide comparable services for less.")[3]; *Guyes v. Nestle USA, Inc.*, No. 20-CV-1560, 2022 WL 18106384, at *8 (E.D. Wis. Nov. 21, 2022) (allowing proposed recordkeeping claim based on allegations that recordkeeping services "are essentially fungible,"

---

[3] Defendants point out that, unlike in this case and *Albert*, *Hughes* involved claims that the defendant should have consolidated the number of recordkeepers it used. *See Hughes*, 63 F.4th at 632 & n.4. But the Court does not read *Hughes* to suggest that the Seventh Circuit viewed the issue of consolidation as determinative in deciding to allow the excessive recordkeeping claim to proceed to discovery.

as well as a comparison of the plan's fees with those charged by similar plans), *report & recommendation adopted*, 2023 WL 22629 (E.D. Wis. Jan. 3, 2023); *Coyer v. Univar Sols. USA Inc.*, No. 1:22 CV 0362, 2022 WL 4534791, at *5 (N.D. Ill. Sept. 28, 2022) (allowing excessive recordkeeping fee claim where the plaintiffs alleged that "the primary drivers of price in large plans are the number of accounts and whether the plan's fiduciaries solicited competitive bids, rather than the marginal cost of recordkeeping for each participant," and the plaintiffs provided comparative information of similarly sized plans' recordkeeping fees, alleging that those plans received at least the same services for less); *cf. Baumeister v. Exelon Corp.*, No. 21-cv-6505, 2022 WL 4477916, at *2 (N.D. Ill. Sept. 22, 2022) (dismissing excessive recordkeeping cost claim based on *Albert* because the plaintiffs "plead no facts to show whether the selected comparators receive recordkeeping services of a similar nature and quality to those offered by the Plan's recordkeeper").

    Defendants' arguments do not compel a different conclusion at this stage. They contend that Mazza's allegations about comparable services and their quality are conclusory and that alternative explanations exist for the differences in charged fees. *See Probst v. Eli Lilly & Co.*, No. 1:22-cv-01106, 2023 WL 1782611, at *1012 (S.D. Ind. Feb. 3, 2023) (allegations that "all mega plans receive nearly identical recordkeeping services and that any difference in services was immaterial to the price of those services" did not "identify what specific types of services comparator plans received"). For example, they note that the Form 5500s for the various comparator plans indicate that their fees did not cover the same services as those provided by Principal to the Plan. *See Glick v. ThedaCare, Inc.*, No. 20-CV-1236, 2022 WL 16927749, at *3 (E.D. Wis. Oct. 27, 2022) (dismissing recordkeeping fee claim where "the amended complaint does not contain any allegations concerning the *specific services* performed by the comparator

10

plans' recordkeepers or any allegations supporting a plausible inference that the plan's recordkeeping services were equivalent to those provided by the comparator plans"), *report & recommendation adopted*, 2022 WL 16924188 (E.D. Wis. Nov. 14, 2022); *Mator v. Wesco Distrib., Inc.*, No. 2:21-CV-00403, 2022 WL 3566108, at *8 (W.D. Penn. Aug. 18, 2022) (rejecting the plaintiff's comparison of the plan's RKA fees to other plans' fees, noting that at least one comparator did not use the same list codes on the Form 5500 and that the comparator plans had a wide variety of participants and asset sizes). While Defendants offer alternative explanations that warrant exploration during discovery, they are not so obvious that they require dismissal of Mazza's claim at the pleading stage, particularly given Mazza's allegations that RKA services are commoditized and that recordkeepers quote fees on a per participant basis without regard for individual differences in the services requested. *See Hughes*, 63 F.4th at 629 ("Only *obvious* alternative explanations must be overcome at the pleadings stage, and only by a plausible showing that such alternative explanations may not account for the defendant's conduct. Accordingly, whether a claim survives dismissal necessarily depends on the strength or obviousness of the alternative explanation that the defendant provides. . . . Where alternative inferences are in equipoise—that is, where they are all reasonable based on the facts—the plaintiff is to prevail on a motion to dismiss."); *Lucero v. Credit Union Ret. Plan Ass'n*, No. 22-cv-208, 2023 WL 2424787, at *5 (W.D. Wis. Mar. 9, 2023) (allowing plaintiffs' recordkeeping claims to proceed, noting that while "Defendants have raised fair points about the probative value of the evidence cited in plaintiffs' complaint to show a violation of defendants' duty of prudence," such arguments were better suited to "a summary judgment motion"). Thus, the Court allows Mazza to proceed on his breach of the duty of prudence claim with respect to excessive RKA fees.

## II. Failure to Monitor

Defendants also moved to dismiss Mazza's failure to monitor claim, arguing that it is wholly derivative of the breach of the duty of prudence claim. *See Albert*, 47 F.4th at 583 ("[H]is duty to monitor claims rise or fall with his duty of prudence and duty of loyalty claims."). Because the Court finds that Mazza has sufficiently pleaded his breach of the duty of prudence claim, the Court allows his failure to monitor claim to proceed as well.

## CONCLUSION

For the foregoing reasons, the Court denies Defendants' motion to dismiss Mazza's amended complaint [16].

Dated: May 18, 2023

SARA L. ELLIS
United States District Judge